IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 16-cv-02607-MSK-NRN

TROY WEBB,

    Plaintiff,

v.

EE3, and
FMC TECHNOLOGIES, INC.,

    Defendants.

___

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**
___

**THIS MATTER** comes before the Court pursuant to Defendant EE3, LLC's ("EE3") Motion for Summary Judgment (**#89**). The Court also has reviewed the opposition and supporting briefing thereto (**#100, #101**).

I. **Jurisdictional Statement**

Mr. Webb invokes the Court's subject-matter jurisdiction premised upon diversity of citizenship under 28 U.S.C. § 1332.

II. **Summary of Relevant Facts**

The Court summarizes the pertinent facts here and elaborates as necessary in its analysis.

EE3 is the owner and operator of an oil well in Jackson County, Colorado. One of the steps in oil production is "oiling" or "hot oiling," by which open flames are used to separate saleable oil from water and condensates. EE3 entered into a subcontract with Adler Hot Oil Services, Inc. ("Adler") to perform the oiling at EE3's Jackson County well. Adler, in turn, contracted with a staffing agency called RifleWorks, Inc. ("Rifle") to provide it with employees.

Mr. Webb was nominally an employee of Rifle, but he performed oiling work for Adler, and was badly burned while doing so. Both Rifle and Adler maintained Worker's Compensation insurance policies, and Mr. Webb applied for and received Worker's Compensation benefits.

Mr. Webb brings this action against EE3 contending that it negligently operated the well in various respects, and that such negligence led to his injuries. In the Amended Complaint **(#43)**, Mr. Webb alleges a single claim sounding in common-law negligence, presumably under Colorado law, against each of EE3 and FMC[1].

EE3 moves **(# 89)** for summary judgment on the claim against it, arguing that it is precluded by the Colorado Worker's Compensation scheme pursuant to C.R.S. § 8-41-401(1)(a).

**III. Analysis**

A. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Thus, the primary question presented to the Court in considering a Motion for Summary Judgment or a Motion for Partial Summary Judgment is: is a trial required?

A trial is required if there are material factual disputes to resolve. As a result, entry of summary judgment is authorized only "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). A fact is material if, under the substantive law, it is an essential element of the claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the conflicting evidence would enable a rational trier of fact to resolve the dispute for either party. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

---

[1] The claim against FMC is not a subject of this motion.

The consideration of a summary judgment motion requires the Court to focus on the asserted claims and defenses, their legal elements, and which party has the burden of proof. Substantive law specifies the elements that must be proven for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson*, 477 U.S. at 248; *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). As to the evidence offered during summary judgment, the Court views it the light most favorable to the non-moving party, thereby favoring the right to trial. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

Motions for summary judgment generally arise in one of two contexts – when the movant has the burden of proof and when the non-movant has the burden of proof. Each context is handled differently. When the movant has the burden of proof, the movant must come forward with sufficient, competent evidence to establish each element of its claim or defense. *See* Fed. R. Civ. P. 56(c)(1)(A). Presumably, in the absence of contrary evidence, this showing would entitle the movant to judgment as a matter of law. However, if the responding party presents contrary evidence to establish a genuine dispute as to any material fact, a trial is required and the motion must be denied. *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

B. <u>Worker's Compensation and the "statutory employer"</u>

Colorado's Workers' Compensation Act "provides exclusive remedies for compensation of an employee by an employer for work-related injury." *Triad Painting Co. v. Blair*, 812 P.2d 638, 641 (Colo. 1991) (citing C.R.S. § 8–41–102*); accord Schwindt v. Hershey Foods Corp.*, 81 P.3d 1144, 1146 (Colo. App. 2003). The statutory scheme created by the Workers' Compensation Act… grants an injured employee compensation from his or her employer without

3

regard to negligence, and it grants the employer immunity from common law negligence liability. *Humphrey v. Whole Foods Mkt. Rocky Mountain/Southwest L.P.*, 250 P.3d 706, 708 (Colo. App. 2010). An employer that has complied with the Workers' Compensation Act is immune from common law damage actions and its employees are limited to the remedies provided by the Act. *Horodyskyj v. Karanian*, 32 P.3d 470, 474 (Colo.2001). In order to claim be benefit of immunity under the Act, the employer has the burden of demonstrating that: (i) at the time of the injury, both employer and employee are subject to the provisions of the Act and that the employer was in full compliance with its obligations thereunder (namely, by supplying mandated Worker's Compensation coverage); (ii) at the time of the injury, the employee was performing services arising out of and in the course of the employee's employment; and (iii) the injury was not intentionally self-inflicted. C.R.S. § 8-41-301(1)(a).

The immunity provided by the Act can extend beyond the employee's nominal employer. C.R.S. § 8-41-401(1)(a)(I) provides:

> Any person, company, or corporation operating or engaged in or conducting any business by leasing or contracting out any part or all of the work thereof to any lessee, sublessee, contractor, or subcontractor, irrespective of the number of employees engaged in such work, shall be construed to be an employer as defined in articles 40 to 47 of [the Workers' Compensation Act] and shall be liable as provided in said articles to pay compensation for injury or death resulting therefrom to said lessees, sublessees, contractors, and subcontractors and their employees or employees' dependents. . . .

Subsection (1)(b)(2) goes on to provide that, where the lessee or subcontractor

> is also an employer in the doing of such work and, before commencing such work, insures and keeps insured its liability for compensation as provided in articles 40 to 47 of [the Workers' Compensation Act], neither said lessee, sublessee, contractor, or subcontractor, its employees, or its insurer shall have any right of contribution or action of any kind, including actions under section 8-41-203, against the person, company, or corporation operating or engaged in or conducting any business by leasing or contracting out any part or all of the work thereof.

The purpose of C.R.S. § 8-41-401 "is to prevent employers from avoiding responsibility under the [Workers' Compensation Act] by contracting out their regular work to uninsured independent contractors." *Finlay*, 764 P.2d at 64; *accord San Isabel Elec. Ass'n, Inc. v. Bramer*, 510 P.2d 438, 440 (Colo. 1973).[2] Thus, the statute "makes general contractors ultimately responsible for injuries to employees of subcontractors." *Finlay*, 764 P.2d at 64. A benefit comes along with this burden, though. Under the Colorado workers' compensation scheme, "[s]tatutory immunity goes hand in hand with statutory liability." *Buzard v. Super Walls, Inc.*, 681 P.2d 520, 523 (Colo. 1984). Therefore, although a "statutory employer" – the label often affixed to the entity contracting out its work -- is generally liable under the Workers' Compensation Act for work-related injuries of its subcontractors and their employees, it also will be immune from any tort claims by subcontractors' employees.

C.R.S. § 8-41-401(1) does not permit injured employees to obtain a double recovery from both a statutory employer and its subcontractors. *Finlay*, 764 P.2d at 64. Instead, as specified in the foregoing statute, "if a subcontractor has obtained insurance[,] its employee cannot reach upstream to the general contractor to establish tort liability; the general contractor is immune from suit as any insured employer would be." *Id.* (quotations and alterations omitted). Thus, so long as a statutory employer's subcontractors maintain appropriate workers' compensation insurance, the statutory employer will be immune from any claim in tort by an injured employee. This aspect of Colorado workers' compensation law "encourages those contracting out work to

---

[2] While *Finlay* considered an early version of the workers' compensation statutory employer stature, which was codified at C.R.S. § 8-48-101, that version was identical to C.R.S. § 8-41-401 in all relevant parts to the Court's analysis. *Phathong v. Tesco Corp. (U.S.)*, 557 Fed. App'x 821, 825-26 (10th Cir. 2014).

5

require that contractors and subcontractors obtain workers' compensation insurance." *Buzard*, 681 P.2d at 523.

1. Adler's status as "employer"

One of the key issues that must be determined is whether Adler was Mr. Webb's "employer". If so, the question of EE3's immunity is a fairly simple one - EE3 contracted its oiling work to Adler, Mr. Webb was an employee of Adler, Adler provided Worker's Compensation insurance to its employees, and therefore, EE3 enjoys immunity from Mr. Webb's suit according to C.R.S. § 8-41-401(1)(a) and (b).

In determining whether Adler was an employer of Mr. Webb, the Court notes that Colorado law acknowledges a "special employment relationship" arises where one employer (the "lending employer," or, sometimes, the "general employer") assigns one of its employees to another employer (the "borrowing employer" or, sometimes, the "special employer"), with the lending employer surrendering the right of control over the employee to the borrowing employer. In such circumstances, the employee "can simultaneously be the employee of two persons." *Evans v. Webster*, 832 P.2d 951, 954 (Colo.App. 1991). *Evans* applied this concept in a factual situation similar to that presented here. Kelly was a business that provided health care services, performed by health care aides, to its clients. Webster contracted with Kelly for the services of an aide, and Kelly directed Evans to go to Webster's home to perform the services. Webster had the primary ability to direct Evans' activities, although Kelly had the right to prohibit Evans from performing tasks that, in Kelly's judgment, Evans was not competent to perform. Webster paid Kelly for Evans' services; in turn, Kelly paid Evans some lesser amount (thereby reserving a profit to Kelly). If Webster found Evans' performance to be deficient, she could contact Kelly and request that Evans be terminated from the Webster-Kelly contract. Evans was injured while

6

performing services for Webster and, after obtaining Worker's Compensation benefits as Kelly's employee, brought suit against Webster sounding in negligence. The Colorado Court of Appeals reversed the entry of a directed verdict in favor of Evans, finding that as a matter of law, Evans was an employee of Webster for purposes of Worker's Compensation immunity.

The decision in *Evans* sets out a nine-factor analysis to determine whether a special employment relationship exists: (i) whether the borrowing employer has the right to control the employee's conduct; (ii) whether the employee is performing the borrowing employer's work; (iii) whether there is an agreement between the lending and borrowing employers; (iv) whether the employee has acquiesced in the arrangement; (v) whether the borrowing employer can terminate the employee; (vi) whether the borrowing employer furnishes the tools and place of performance; (vii) whether the employment was to be for a considerable length of time; (viii) whether the borrowing employer had the obligation to pay the employee; and (ix) whether the original employer terminated its relationship with the employee. 832 P.2d at 955. However, *Evans* explains that the fourth element – the employee's acquiescence – is "of critical importance" and, when coupled with the first element (control over work activities) and the fifth element (the ability to terminate the relationship), the results can be dispositive. *Id.* Examining whether Evans acquiesced to work for Webster, the court noted that "the only work to be done was that of Kelly's clients"; that is, Kelly did not have any work operations of its own other than supplying staff to perform to work of its clients. In addition, Evans could have declined assignment to Webster but did not, and that the nature of Evans' employment with Kelly allowed Kelly to send Evans to various locations. These facts, the court found, established Evans' acquiescence to work for Webster. The court further noted that Webster had the ability to direct Evans' work and had the ability to terminate Evans' assignment or her own contract with Kelly.

7

Accordingly, the court found no need to examine the remaining factors and concluded as a matter of law[3] that "both Kelly and [Webster] were employers of [Evans]." *Id.* at 955-56.

Here, the record unambiguously establishes two of the three factors found to be critical in *Evans*. It is clear that Mr. Webb knew that, despite nominally being employed by Rifle, he would be assigned to work for Adler. Indeed, Mr. Webb's own testimony establishes that he specifically <u>intended</u> for that to occur. He testified that he spoke to Adler personnel about obtaining a job there, and that Adler sent him to Rifle to process the paperwork to do so. Mr. Webb completed that paperwork fully expecting that he would thereafter be assigned to an Adler jobsite. Thus, it is clear that Mr. Webb knowingly acquiesced to performing work for Adler.

It is also undisputed that Adler had the ability to "terminate" Rifle employees it deemed unsatisfactory. Paul Briggs, Adler's representative testified that, if it was unsatisfied with an employee's performance, "we could . . . release Rifle[ ] from the account." This is similar to the situation in *Evans* where, if Webster was dissatisfied with Evans' performance, she "could . . . cancel the contract with Kelly." 832 P.2d at 954.

As to the critical issue of whether Rifle, Adler, or both control the work of employees on Adler's work site, the evidence is complicated. Mr. Briggs testified that although agencies like Rifle are expected to supply safety training for employees, Adler "do[es] it on our own as well," apparently because they distrust the level of training provided by Rifle. Mr. Briggs also acknowledged that, because Rifle is not engaged in the business of providing oiling services,

---

[3] Because the Court finds that there is no genuine dispute of fact and that Adler's status as an employer can be determined as a matter of law, Mr. Webb's reliance of *Radil v. Sanborn Western Camps*, 384 F.3d 1220 (10th Cir. 2004), is inapposite. Although the question of whether an employer enjoys Worker's Compensation immunity is generally reserved for the trier of fact, here, the Court determines that there is no genuine factual dispute to be tried. This case does not present the sort of hotly disputed factual issues that required a trial in *Radil*. *Id.* at 1226-27.

8

"we" – Adler – "had to train [Mr. Webb]." Rifle did have the authority to "stop the work themselves if they felt . . . we were putting their guys in danger," but when asked to clarify whether Rifle had the authority to control how employees "actually performed hot oil services," Mr. Briggs responded that "they did not." Mr. Briggs agreed that Rifle "could not tell [Adler] how to do [its] job, other than if there was a safety concern." But he contended that Rifle "could tell [Mr. Webb] how to be a hot oiler," although "they never did." Adler had some ability to direct and control Mr. Webb; as Mr. Briggs explained "we could not actually tell [Rifle employees] 'this is how we want it done exactly.' We could just say 'to be safe, these are the protocols that must be followed or you are no longer on our account.'" But pressed further by counsel, Mr. Briggs acknowledged that Adler "instructed [employees like Mr. Webb] how to do that job" and "maintained authority over [them]" "per [Adler's] spec." Asked if Adler had "responsibility for supervising Mr. Webb," Mr. Briggs seemed to agree that it did, "ensur[ing] that he followed our safety protocols and our SOPs," which are "almost 100 percent how to safely accomplish the job." Mr. Briggs stated that Adler would "train [Mr. Webb] as to how to do the job to achieve a result," and that Rifle would not provide training of that type. Adler directed Mr. Webb as to what time to show up and the shop each morning and would direct the workplace to which he would be assigned that day.

Cindy Winschell, Rifle's representative, also testified about Rifle's arrangement with Adler. She testified that although Rifle's contract with Adler provided that Rifle "retains all authority, direction, and control of the employees," in actuality, Rifle "had no authority when [its employees] were on the job site" of Adler. She again testified later that "we really didn't have any direction over what [Mr. Webb] did on the job site," and that Adler "made all the decisions." She testified that Adler was responsible for supervising Mr. Webb's work. She indicated that

9

Adler, not Rifle, would train employees as to how to perform oiler duties. She testified that Rifle did not have any sort of supervisor who would go to a job site and watch over the work being performed by Rifle's employees. Ms. Winschell testified that Adler had a right to terminate Rifle employees, and had the ability to modify the terms of their compensation or schedule as Adler saw fit.

Mr. Webb's own testimony indicates that, on the date of the accident, he was taking instructions from Seth Dalberg, whom Mr. Briggs confirmed was an employee of Adler. Mr. Webb testified that a representative of Rifle only came out to the job site "once or twice, just checking in." He agreed that Rifle did not perform any training, and that it was Adler that trained him how to perform oiler services.

Taken as a whole, the record reflects that there is no genuine dispute that Adler possessed and exercised the ability to direct and control Mr. Webb's work in the field. Rifle and Adler drafted contracts that purported to give Rifle the exclusive authority to direct and control its employees, nominally reserving no control whatsoever to Adler, but in practice, Adler gave all day-to-day directions to Rifle employees like Mr. Webb. It is undisputed that Rifle employees were rarely, if ever, on site to supervise or direct its employees, and that Mr. Webb instead took his directions from Mr. Dalberg, an Adler employee. Adler provided all the training, directed employees as to schedules and locations, and dictated how they were to perform their jobs. Mr. Briggs' careful statements that Adler could only instruct Rifle employees to follow Adler's "safety protocols," not instruct them directly, nevertheless indicate that those protocols were inextricably bound up in how Adler wanted the job performed and that the failure to follow Adler's instructions would result in the employee's termination from Adler's worksite. More tellingly, there is absolutely nothing in the record to suggest that Rifle ever sought or intended to

exercise any control over its employees when they were performing services for Adler. Neither Mr. Briggs nor Ms. Winschell nor Mr. Webb ever identified an individual from Rifle that ever purported to give instructions to Rifle employees while at the well, nor even identified such a person who issued such instructions from Rifle's offices.

Mr. Webb argues that, under Colorado law, the key determinant of employer status is "the right to control, not the fact of control." *Citing Perkins v. Regional Transp. District,* 907 P.2d 672, 674 (Colo.App. 1995), *citing Dana's Housekeeping v. Butterfield*, 807 P.2d 1218, 1220 (Colo.App. 1990). But this argument misconstrues that principle. Were Mr. Webb asserting a claim against Rifle, and Rifle were defending itself by asserting that Adler was Mr. Webb's sole employer, it might be appropriate to apply the principle, finding that although Rifle never <u>actually</u> exercised control over Mr. Webb, it nevertheless possessed the <u>right</u> to do so. In other words, the articulated principle applies to an entity who, although possessing the right to supervise an individual, passively refuses to exercise that authority; in such circumstances, the right to control is more important than whether that right is exercised. But the principle does not function in reverse to shield an entity from liability when it exercises control over an employee even though another has the nominal authority to do so. To so hold would require the Court to ignore reality. Adler must have had the "right to control" Mr. Webb's work because it actually did so, even if its contract with Rifle promised that it would not. As *Perkins* -- the case Mr. Webb relies upon -- observes, "how the parties refer to themselves in their contract is not dispositive." 907 P.2d at 675. Where an entity actually exercises the power to control an individual's work, the conclusion that the entity also had the right to exercise such power naturally follows.

Accordingly, the Court finds that Adler had and exercised the authority to direct and control Rifle employees like Mr. Webb while they performed work for Adler. As cases like *Evans* make clear, the factors of employee acquiescence, right to terminate, and right to control suffice to permit a finding as a matter of law that a defendant had a special employment relationship with the plaintiff, and the Court finds here that Adler was as much Mr. Webb's employer as Rifle was.

2. Scope of employment

Mr. Webb argues that, even if Adler was his employer, his injury did not occur within the scope of his employment for Worker's Compensation purposes because Adler was negligent in several respects – *e.g.* that it did not provide him with a gas monitor or adequate training to perform the tasks he was assigned to when the accident occurred. The Court will not belabor this argument. An employee is acting within the scope of his employment if, at the time of the injury, he is "directly participat[ing] in activities assigned or directed by the employer." *Maryland Cas. Co. v. Messina*, 874 P.2d 1058, 1063 (Colo. 1994). That inquiry considers factors such as whether the activity occurred during working hours, on the employer's premises, whether it was contemplated by the nature of the employment, and whether the obligations of employment created the zone of danger from which the injury arose. *Id.* The question of whether the employer should have asked the employee to perform that task is not an appropriate factor. Indeed, inquiry into whether the employer's precautions or directives to the employee were reasonable and sound are inconsistent with the whole notion that the Worker's Compensation scheme operates independently of fault on either side. *See generally Humphrey v. Whole Foods Market*, 250 P.3d 706, 708 (Colo.App. 2010). Accordingly, the Court rejects Mr. Webb's argument that his injuries did not occur during the course of his employment with Adler.

12

### IV. Conclusion

For the foregoing reasons, EE3's Motion for Summary Judgment **(# 89)** is **GRANTED**. EE3 is entitled to judgment in its favor on Mr. Webb's claim against it. Neither party having requested that judgment pursuant to Fed. R. Civ. P. 54(b) enter immediately, the Court will not direct the entry of such judgment until the proceedings involving the remaining Defendant, FMC, are completed. No dispositive motion having been filed regarding Mr. Webb's claim against FMC, that claim will proceed to trial. The parties shall prepare and file a Pretrial Order consistent with the Court's Trial Preparation Order **(# 59)** within 21 days, and shall jointly contact the Court to schedule a Pretrial Conference.

Dated this 27th day of March, 2019.

**BY THE COURT:**

_/s/ Marcia S. Krieger_

Marcia S. Krieger
United States District Judge